# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DANNY W. MORRIS,                    )
                                    )
    Plaintiff,              )
                                    )
v.                                  )    No. 3:12-cv-0387
                                    )    Chief Judge Haynes
                                    )
FOUR STAR PAVING, LLC,              )
                                    )
    Defendant.              )

## M E M O R A N D U M

Plaintiff, Danny W. Morris, filed this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. against the Defendant, Four Star Paving, LLC, his former employer. Plaintiff's claim is that although aware of Plaintiff's religious beliefs as a Seventh Day Adventist, the Defendant refused to provide Plaintiff a reasonable accommodation of not working on Saturday, his Sabbath. Plaintiff alleges that Defendant's actions caused Plaintiff a loss of employment benefits and enjoyment of life, embarrassment, humiliation, and emotional distress. In its answer, Defendant alleges that Plaintiff's inability to work on Saturday would cause an undue hardship on Defendant and also that Defendant offered Plaintiff a reasonable accommodation.

Before the Court is Defendant's motion for summary judgment (Docket Entry No. 18), contending, in sum, that Plaintiff's failure to accommodate claim fails because the Defendant is unable to extend a reasonable accommodation without incurring an undue hardship and that Plaintiff rejected the Defendant's offer as an hourly worker who would not be required to work on Saturday. In response, Plaintiff contends that factual disputes on the Defendant's hardship defense and the

1

reasonableness of the hourly position offer exist to preclude summary judgment. (Docket Entry No. 20).

For the reasons below, the Court concludes that summary judgment should be denied because material factual disputes exist on the legitimacy of the Defendant's undue hardship defense and the offer of an hourly position.

### A. Review of the Record[1]

The Defendant, Four Star Paving, LLC, is a commercial and residential asphalt paving company in Nashville, Tennessee. (Docket Entry No. 18-3, Maynard Affidavit at ¶ 2). Mike Maynard, along with several others, founded Four Star in 2002, after leaving their employment at Asphalt Paving and Curb, ("APAC"). Id. at ¶ 3. Four Star is a family business, id. at ¶ 9, and Plaintiff's brothers and many of his relatives work for Four Star. (Docket Entry No. 18-4, Plaintiff Deposition at 37-38).

Four Star hired the Plaintiff in early 2003 (Docket Entry No. 18-3, Maynard Affidavit at ¶ 3), as a base foreman who was responsible for the overall operation of his crew. Id. at ¶ 3. In his prior employment with APAC, Plaintiff worked as a base foreman. (Docket Entry No. 18-4, Plaintiff Deposition at 61-62). As a base foreman, Plaintiff's duties includes supervising his crew and also preparing the surface for the asphalt. Id. at ¶ 5. To prepare the surface, the base foreman operates the grader equipment and controls the height and angle of the grader blades that spread and level the

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court concludes that there are material factual disputes. Thus, this section does not constitute findings of fact under Fed. R. Civ. P. 56(d).

earth, sand, gravel, and/or rock in preparation for the asphalt. Id. at ¶ 6. To operate the grader properly, the base foreman must have substantial skill and training. Id.

Four Star's work schedule depends upon customer demands and the weather. (Docket Entry No. 18-5, Maynard Deposition at 78). Asphalt must be laid in dry weather and at an appropriate temperature. (Docket Entry No. 18-3, Maynard Affidavit at ¶ 8). Charles Birdwell and Mike Maynard decide each week if work on Saturday is necessary to complete their jobs. (Docket Entry No. 18-6, Birdwell Deposition at 46). Seventy-five percent of Four Star's business is repeat business and customer satisfaction is important. (Docket Entry No. 18-5, Maynard Deposition at 79).

For a period of time, Plaintiff and Charles Birdwell attended the same Baptist church. (Docket Entry No. 18-6, Birdwell Deposition at 20). In the winter of 2009-2010, Plaintiff began bringing scripture passages to work and discussing them with Birdwell. Id. at 22. At that time, Plaintiff stopped attending the Baptist church and began attending the Seventh Day Adventist Church, telling Birdwell that "he thought that [the Seventh Day Adventists] w[ere] biblically practicing the truth of the word . . . by his interpretation." Id. at 23. Birdwell who is familiar with the Seventh Day Adventist church, knew that Saturday is that religion's Sabbath. Id. at 25. Plaintiff also told Birdwell that Saturday is the Sabbath for Seventh Day Adventists. Id. at 26.

Plaintiff was an "excellent employee," (Docket Entry No. 18-5, Maynard Deposition at 12), who was dependable, early to work, late to leave, and always performed well. Id. Defendant sent Plaintiff to a twelve-month leadership program in 2009 and Plaintiff was being groomed to assume Charles Birdwell's position upon the latter's retirement. (Docket Entry No. 18-4, Morris Deposition at 106). After he began observing the Sabbath as a Seventh Day Adventist, Plaintiff was told that he was ineligible for the promotion to Birdwell's position. Plaintiff testified at his deposition on this

issue:

>Plaintiff: He told me that I wouldn't be able to have the superintendent's job that I was looking forward to receiving.

* * *

>Question: . . . during your discussion with Mr. Maynard that the reason you couldn't have the promotion was because you said you wouldn't be available for work on Saturday?

>Plaintiff: Not at that time. I told him that I understood that I wouldn't be receiving it.

>Question: And why is it you understood that you wouldn't be receiving the promotion?

>Plaintiff: Because he was the CEO and if he said I wasn't going to receive it, I understood that I wasn't going to receive it.

>Question: Did you understand why?

>Plaintiff: It's because I requested a – to have the sabbath off.

(Docket Entry No. 18-4, Plaintiff Deposition at 106, 109).

Mike Maynard first became aware of Plaintiff's new religious belief and affiliation with the Seventh Day Adventist in late 2009 or early 2010. (Docket Entry No. 18-5, Maynard Deposition at 18). At that time, Mike Maynard was aware that Seventh Day Adventist's Sabbath was from sundown on Friday to sundown on Saturday. Id. at 19. As Mike Maynard explained:

>Question Did you connect your learning of Mr. Morris' affiliation – or the fact that he had left Mr. Birdwell's church to go to a Seventh Day Adventist Church, did you connect that in any way with his work at Four Star or his future work at Four Star?

>Maynard: Well, I sensed that it could be a problem down the road. I didn't know to what degree of commitment he was making to the Seventh Day Adventist, though. I did not know that.

Id. at 19-20.

In 2010, the Four Star workforce did not work any Saturdays until June when Plaintiff's crew

4

was scheduled to work on June 5, 2010 and June 26, 2010. (Docket Entry No. 18-3, Maynard Affidavit at ¶ 11). Plaintiff failed to report for work on any Saturday. Id. Without his supervision, Plaintiff's crew was unable to work. Id. When Plaintiff failed to report for work on Saturday, June 4, 2010, Maynard met with Plaintiff at a job site to explain the importance of Plaintiff's presence and the Saturday work day.

> Maynard: We met at Cobblestone Land. That's where he was working at. And I went to talk to him as much as a friend as I did as an employer at this particular time. And I explained the circumstances of why we needed him to work, why that was important to us as a company, and explained why he needed to work to do that.

> \* \* \*

> Question: Okay. And you said that you explained the circumstances of why you needed Mr. Morris to work. Can you tell me what the details of your conversation with him about that were?

> Maynard: Yeah. I explained to him that it would be a severe morale problem to the other salaried employees if he was not working and everybody else was. **I told him it would be a severe hindrance to us as a company, operational, you know, if he was not working, that it was going to hinder our progress and our ability to be able to service our customers, because I explained to him that we're a subcontractor, and being a subcontractor, we're at the mercy of the people we work for. And if they demand that we work or we're behind schedule or it has to be a Saturday job, then we've got to be able to perform to be able to get that repeat customer.**

(Docket Entry No. 18-5, Maynard Deposition at 24-25) (emphasis added).

According to Plaintiff, during this conversation, Defendant informed Plaintiff that he could not be a foreman if Plaintiff were unable to work on Saturday:

> Plaintiff: On June the 4th Charles Birdwell first came to me that morning. This was on a Friday. And Charles – this was after they was fixing to work June the 5th.

> Question: Okay.

> Plaintiff: And Charles asked me if – said that we're going to be working tomorrow and I need to know where you stand. And I told him I would be standing – I'd be at church. And

he asked – or he told me, I'm telling you right now, you're fixing to lose your job.

Question: Mr. Birdwell told you that?

Plaintiff: Yes.

Question: Did he tell you why?

Plaintiff: It was understandably because I wouldn't agree to come in to work the next day.

Question: And why was that understandable?

Plaintiff: Because that pertained to the matter at hand when he told me I was fixing to lose my job.

Question Did Mr. Birdwell or Mr. Maynard at any time have any discussion with you about why it was important for you to be at work on Saturdays when other Four Star employees had to be at work on Saturdays?

Plaintiff: Later that day.

Question: What did they tell you about that?

Plaintiff: **That's when Mike came out to the job and told me I couldn't be a foreman and not work Saturdays. And I asked him why, and he said because all foremans are required to work on Saturdays.**

(Docket Entry No. 1804, Plaintiff Deposition at 110-11) (emphasis added).

On June 8, 2010, the Plaintiff sent Maynard a letter requesting an accommodation for his religion's Saturday Sabbath.

Dear Mike Maynard:

I am writing this letter in concern of the issue that has arisen involving my faith and my work. We met and talking in your office on Wed., April 21, 2010 on this matter. I think you know how greatly I appreciate my job with Four Star Paving and because of this I hope for your kind consideration in working with me in my particular situation. **I am studying to become a member of the Seventh-day Adventist Church and from a sincere religious conviction have been observing the Sabbath, which we keep according to the Bible from sunset on Friday to sunset on Saturday. It would now be a violation of my deeply held, sincere religious convictions to work during the Sabbath hours. Therefore, I**

**respectfully request that you make an accommodation of my religious beliefs and practice in harmony with Title VII of the Civil Rights Act and the Guidelines of the Equal Employment Opportunity Commission.**

I do not request to have the Sabbath off in order to have an extra day at home to catch up on odd jobs or to engage in recreation. All secular activities, shopping, sports, entertainment and employment, are laid aside. The Sabbath is sacred to me and my family and I now devote these hours to God. I can have my pastor write a letter to affirm the credibility of my new religious beliefs and experience if necessary.

Please understand that I am willing to work any other hours as I have always, except the Sabbath hours. I would hope that we can come to a mutual agreement on this issue and that both parties interest are satisfied.

Sincerely,

Danny W. Morris

(Docket Entry No. 22-2) (emphasis added).

Maynard responded to the Plaintiff's letter citing the Defendant's inability to excuse Plaintiff from Saturday work:

Dear Danny:

I have reviewed your June 8, 2010 letter to me. While I am sympathetic with your situation involving your studying to become a member of the Seventh Day Adventist Church, Four Star Paving is unable to offer you a reasonable accommodation, under Title VII of the civil Rights Act that would not force the company to incur an undue hardship. As you know, your business requires us to work some Saturdays during the year. As a salaried foreman, it is necessary for you to work on those Saturdays we have to work. The company does not work on Sunday unless absolutely necessary, and there is no way your desire to be off on all Saturdays throughout the year can be accommodated without an undue hardship being incurred by the company.

Yours truly,

Mike Maynard

(Docket Entry No. 22-3).

Charles Birdwell and Mike Maynard discussed demoting Plaintiff to an hourly position of

Question: No?

Maynard: **It would not be permanent.**

Question: Why not?

Maynard: **Because it's just – it's too hard to have a position – have his position be a part-time job. Due to our job schedules, especially like in the fall of the year, as Charles explained earlier, it's all hands on deck. And we've got three base foremen. We've probably got – in the fall of the year, in a typical year, we've probably got 10 people wanting us on that job on that Saturday we're working . . . .**

\* \* \*

Question: I guess my question is, if that had gone forward, and you did see what happened, what were the options? I mean, was it a situation where he was either going to return to a foreman's position and agree to work on Saturdays, or there wouldn't be any job there for him at all if he continued to tell you that he needed to be excused on Saturdays?

Maynard: Well, I don't have a crystal ball. I couldn't tell you what was going to happen in the future. I just know what our whole approach the whole time was that Danny was one of our most valuable employees. He has worked with us for 25 years. I considered him one of our best employees. We were going to advance him up to be a superintendent. That's how much we thought about him. And it was our goal to try everything in our power to try to keep him there. And so if that was to pacify him with working Monday through Friday on a grader for awhile, then that's what we were going to try to do.

Question: Well, I guess my question is, what was going to happen at the end of that while?

Maynard: I don't have an answer for that. We never got that far, so I don't know. I mean, would it have been a permanent solution? Probably not. But at the same time, because of Danny's situation and how good of an employee he was, we were willing to stretch it out as far as we thought was possible. Now, I can't answer how long we would have went with that. You know, we just valued him that much to want to try to come up with some kind of ideas to try to keep him there.

Question: You testified that you were thinking maybe he might come back around and change his mind again. So what do you mean by that when you say you were –

Maynard: Well, it's like I stated last time. He went from, you know, not going to church at all to becoming a Baptist. In the span of another couple of months, he was Seventh Day Adventist where he wasn't going to work on Saturdays. So he had been 360 in a span of three months. You know, our thinking was that once he has time to think about the repercussions

grader operator during the week so Plaintiff would not have to work on Saturdays as a foreman.

(Docket Entry No. 18-6, Birdwell Deposition at 67-68, 75). Maynard testified in his deposition that

he provided Plaintiff the option of working as an hourly employee:

> Question: So when you say I proposed to reduce his role to a grader operator, that would have been reducing his role to an hourly employee, and that was first proposed to Mr. Morris on June the 12th. Correct?
>
> Maynard: Yes, sir.
>
> Question: Okay. And it says only for a short time out of respect for him. And I guess my question is, what does that mean?
>
> Maynard: Well, you've got to put yourself in my position. You know, a year before this happened – this is no offense to Danny, but he was drinking beer and playing golf on Sunday afternoon. He went and changed his faith, became a Christian, which we was all very excited about for him, and in a period from December to whenever, February, March, whenever that time was he changed to Seventh Day Adventist. So from out perspective, we was thinking maybe he might come back around and change his mind again. So when you've got a valuable employee like him as much – as good as an employee he is – we spent a lot of time and money in training him over the years, and he's an excellent employee. And so I don't know how your business is, but if I've got a good employee, I'm trying to figure out every way in the world to try to keep him.
>
> Question: Okay. I mean, I understand that. I guess my focus is on only for a short time. What does that mean?
>
> Maynard: **Well, that means that we were willing to try the role as a grader operator, and short time could have meant anything, quite honestly. We didn't know where it was going. We didn't know how this was going to turn out. So we were basically willing to just try to get things by for a little longer to see how he felt. He may have changed his mind once he came a grader operator and lost his foremanship. We thought maybe he might change his mind and want to come back and do that. So it was just strictly a period of us not really knowing what to do at the time, other than we wanted to keep him.**
>
> Question: It could have been permanent if he had decided he wanted to stay as a grader operator. **You were willing to work with him and hopefully make him permanent in that role. Right?**
>
> Maynard: **No, sir.**

8

of what he was going and how he was affecting his family that, you know, maybe he would reconsider that and be willing to come back and work Saturdays. That was what our hope was the whole time, that he would be willing to come back and work Saturdays.

\* \* \*

Question: So you were essentially taking it one step at a time because you weren't sure what the future was going to hold. Is that correct?

Maynard: That's correct. All I knew it – is he was a good employee, and I wanted to give him every opportunity to think about what he was doing.

Question: But you weren't going to let him think about what he was doing by allowing him to remain as a foreman and be excused on Saturdays?

Maynard: No, sir. He could not be a foreman on Saturdays. If other guys had to work, he was going to have to work, too. I was not going to go down the road of creating a morale problem with the other employees. They worked hard just like he did. They're good employees like he was. And if they had to come in on Saturdays, then he needed to come in also and be part of our management team.

(Docket Entry No.18-5, Maynard Deposition at 32-34, 44-45) (emphasis added). Neither Birdwell nor Maynard had a plan if Plaintiff accepted the hourly position as a grader operator during the week. (Docket Entry No. 18-6, Birdwell Deposition at 77). In any event, Birdwell testified that Plaintiff declined the offer to work hourly as a grader operator during the week. Id. at 82.

Plaintiff considered himself a victim of discrimination and that Four Star did not really attempt to accommodate him: "If I was offered a lower position, why was it just for a temporary time? If I could be accommodated by an hourly position, why it was just for a short period of time?" (Docket Entry No. 22-1, Plaintiff Deposition at 141). At his deposition, Plaintiff described Maynard's statement that a job as an hourly worker "was never an option."

Question: Okay. Did Mr. Maynard not talk with you about moving from a foreman position to an hourly employee position?

Morris: I asked him what about working by the hour, and he said that was never an option.

10

Question: Didn't you tell him that you weren't comfortable with an hourly employee position?

Morris: I wasn't comfortable with working with Ronald, if that was one of the options.
Question: Why weren't you comfortable working with Ronald?

Morris: He just likes to holler at everybody.

* * *

Question: Okay. And wasn't it after you told Mr. Maynard that you weren't comfortable with that situation that he offered you to have through Friday to think about what you wanted to do?

Morris: That was whether – if I was working that Saturday or not.

Question: Right. And he told you that he wanted to give you that time, through Friday, to think about what you wanted to do after you had told him you weren't comfortable with the hourly employee position; is that right?

Morris: No.

Question: That's not correct?

Morris: It was all about me working that Saturday, is what the Friday deadline was about.

* * *

Morris: That's when I had asked about working by the hour, and I told him at that time. And I was the one that suggested that we could work – that I could work by the hour –

Question: Okay.

Morris: – after I was told I couldn't be a foreman. And the reason I suggested it is because I though maybe Charles had suggested it already, and Charles told me that Mike wasn't comfortable with it.

Question: Okay.

Morris: Or he wasn't having anything to do with it, I think was Charles' words.

(Docket Entry No. 18-4, Plaintiff Deposition at 132-34).

Plaintiff's "Consecutive Employee Warning Report" reflects that Plaintiff received three "disciplinary actions" for his failures to work on Saturdays in June 2010. (Docket Entry No. 22-6, Plaintiff's Disciplinary Report). Plaintiff's report reflects:

| Type of Repetitive Violation: Insubordination | | |
|---|---|---|
| First Disciplinary Report | June 5, 2010 | Talked with Danny about repercussion of not working Saturdays. Signed, Maynard |
| Second Disciplinary Report | June 26, 2010 | Failure to work on Saturday. Signed, Maynard |
| Third Disciplinary Report | June 28, 2010 | Danny was told he would work Saturday if he continued to stay here. He said he would not and quit. We gave him till Friday 7-2-10 to make his decision. He said he didn't need any more time. |

Id.

When Plaintiff failed to report on those Saturdays in June, and ultimately stopped working at Four Star, the Defendant was unable to utilize Plaintiff's crew to perform a job.

Question: Okay. Now, we know that Mr. Morris did not work on June 5th, 2010, but it appears that Mr. Birdwell and Mr. Johnson did. Is that correct?

Maynard: It is.

Question: Okay. Was there a third job on June 5th, 2010 that Mr. Morris did not handle?

Maynard: Yes, ma'am.

Question: And how did that affect your business?

Maynard: We had to shut that crew down.

* * *

Question: All right. On June 26th, 2010, which was also a Saturday, Mr. Morris was

12

scheduled to work that Saturday as well?

Maynard: Yes, ma'am.

Question: When Mr. Morris did not show up for work on Saturday, June 26th, 2010, what did you all do?

Maynard: We shut his crew down again.

\* \* \*

Question: After Mr. Morris left, you were down a base foreman. You went from having three base foremen to run crews to two. Is that right?

Maynard: Yes, ma'am.

Question: How did that affect your business?

Maynard: Well, we just didn't have the maneuverability to be able to get our work done for our customers like we wanted to. I mean, you basically reduced our capacity 33 percent.

Question: So what did the other two base foremen have to do after Mr. Morris quit?

Maynard: Had to work harder.

Question: How so?

Maynard: Had to work more, longer hours, more Saturdays. I mean, just – somebody had to cover that slack.

(Docket Entry No. 18-5, Maynard Deposition at 83-84, 88).

The parties dispute whether Plaintiff quit his employment or Birdwell and Maynard terminated him. Plaintiff testified:

Question: All right. Tell me about your statement that you didn't quit. Why is it your testimony that you didn't quit?

Plaintiff: As Mike – Charles and I went into Mike's office.

Question: Yes, sir.

13

Plaintiff: Mike was straightforward, and as we was taking our seats in front of his desk he said, Danny, he said, We're working – or we have given you some time to think this over and we need a decision by Friday and – whether you're going to work Saturdays or not. And I said, well, Friday's not going to change a thing, I said, because I'll still be standing in my faith and the word of the Lord and my convictions of it. And Mike said, well, we can't have that.

(Docket Entry No. 22-2, Plaintiff Deposition at 129).

As to whether his refusal to work on Saturdays caused Four Star an undue hardship, Plaintiff

testified:

Question: And what evidence do you have to establish that you as a base foreman being off every single Saturday for the rest of your career at Four Star would not have caused an undue hardship on the company?

Plaintiff: It hasn't.

Question: How do you know?

* * *

Plaintiff: That there's times when foremans haven't worked when other foremans have. This has been since I was terminated. There's been other Saturdays that only one foreman worked; there's been other Saturdays when one case foreman worked when there was two; one paving foreman worked when there was two.

(Docket Entry No. 22-1, Plaintiff Deposition at 141-42).

## B. Conclusions of Law

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee notes. Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord Routman v.

Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact.
>
> **As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.** Factual disputes that are irrelevant or unnecessary will not be counted.

Id. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electrical Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326. Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989); see also Routman, 873 F.2d at 971.

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Celotex Court:

Of course, a party seeking summary judgment always bears the initial responsibility

of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

477 U.S. at 323 (emphasis deleted).

As the Sixth Circuit explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex, 477 U.S. at 322 and Rule 56(e)).

Once the moving party meets its initial burden, the Sixth Circuit warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion. . . . [and] must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Liberty Lobby, 477 U.S. at 251, 255). Moreover, the Sixth Circuit explained that

The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'"

Street, 886 F.2d at 1480 (citations omitted); see also Hutt v. Gibson Fiber Glass Products, 914 F.2d

16

790 (6th Cir. 1990) (quoting Liberty Lobby, 477 U.S. at 151-52) ("A court deciding a motion for summary judgment must determine whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.").

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, **summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.**
>
> * * *
>
> Progressing to the specific issue in this case, we are convinced that **the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.** If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. **The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."**

Liberty Lobby, 477 U.S. at 248, 252 (citations omitted and emphasis added).

It is likewise true that

> [I]n ruling on motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute . . . ."

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Sixth Circuit stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) (citation omitted).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of."
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (citation omitted). In this district, the parties must provide specific references to the proof upon which they rely. See Local Rule 56.01(c) (requiring each party to provide a statement of undisputed facts to which the opposing party must respond).

In Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989), the Sixth Circuit discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1.    Complex cases are not necessarily inappropriate for summary judgment.

2.    Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.    The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4.    This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.    A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law."

6.    As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.    The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.    The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9.    The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.    The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Id. at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed

19

upon a motion for summary judgment: (1) whether the moving party "clearly and convincingly" established the absence of material facts; (2) if so, whether the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense; (3) if factual support is presented by the nonmoving party, whether those facts are sufficiently plausible to support a jury verdict or judgment under the applicable law; and (4) whether there are any genuine factual issues with respect to those material facts under the governing law?

### 1. Failure to Accommodate Claim

Title VII prohibits an employer from refusing a reasonable accommodation for an employee's religious practices. TWA v. Hardison, 432 U.S. 63, 73 (1977). For a prima facie showing of such a failure, a Plaintiff must prove that: (1) the plaintiff holds a sincere religious belief that conflicts with an employment requirement; (2) the plaintiff informed the employer about the conflict; and (3) the employer either discharged and/or disciplined the plaintiff for failure to comply with the conflicting employment requirement. Smith v. Pyro Mining Co., 827 F.2d 1081, 1085 (6th Cir. 1987). If a plaintiff establishes a prima facie showing of religious discrimination, then the burden shifts to the defendant to prove an undue hardship to accommodate the employee. Id.

"The obligation to accommodate includes efforts to accommodate those employees who refuse to work on particular days of the week because of their religious beliefs." Smith, 827 F.2d at 1085. An employer has a duty to accept an employee's proposed accommodation unless that accommodation causes an undue hardship on the employer's business. Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68 (1986). The employer must prove it is "unable to reasonably accommodate [] an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." Hardison, 423 U.S. at 73-74. An undue hardship is shown if

the employer "bear[s] more than a de minimis cost . . . to accommodate an employee's religious beliefs." Tepper v. Potter, 505 F.3d 508, 514 (6th Cir. 2007). Actual proof of undue hardship does not require an actual undertaking of accommodation. For an accommodation, the employer is not required to hire additional workers or risk production losses. Cooper v. Oak Rubber Co., 15 F.3d 1375, 1378-80 (6th Cir. 1994). Also, an accommodation at the expense of other employees is not required. Hardison, 423 U.S. at 85. The reasonableness of a religious accommodation is made on a case-by-case basis and is usually decided by the jury. E.E.O.C. v. Arlington Transit Mix, Inc., 957 F.2d 219 (6th Cir. 1991).

Neither side disputes whether the Plaintiff meets the requirements of his prima facie showing. Given his sincere religious beliefs as a Seventh Day Adventist and that Plaintiff informed the Defendant of his religious belief and the resulting conflict, the Court concludes that Plaintiff's proof satisfies the first two prongs. Plaintiff's proof also satisfies the third prong, as the Defendant disciplined Plaintiff three times for missing work on Saturdays.

As to the religious accommodation issue, Defendant contends that Plaintiff rejected Defendant's offer of a reasonable accommodation of an hourly position as a grader operator during the week. (Docket Entry No. 1801 at 16). Defendant cites any other accommodation as an undue hardship because "Plaintiff's refusal to work resulted in his project being shut down and his crew being sent elsewhere." Id. at 18. The Defendant contends that on occasions, Saturday work is "essential to Four Star's business" and "[a]llow[ing] Plaintiff strict observance of his religious beliefs could only be done at the expense of others who had strong, but perhaps nonreligious, reasons for not working on weekends." Id. at 19. Defendants assert that exempting Plaintiff from Saturday work would also jeopardize Defendant's relationship with its customers and general contractors who

provide Defendant with repeat business.

Plaintiff alleges that "[c]ontrary to defendant's arguments, plaintiff's testimony is that it was [plaintiff] not the defendant, who proposed his working in the hourly position of grader operator, and that when he made the offer, it was rejected by defendant." Plaintiff cites the following testimony from his deposition:

> Question: Okay. Did Mr. Maynard not talk with you about moving from a foreman position into an hourly employee position?
>
> Plaintiff: I asked him what about working by the hour, and he said that was never an option. (Docket Entry No. 18-4, Plaintiff Deposition at 132). . . .
>
> Plaintiff: That's when I had asked him about working by the hour, and I told him at that time. And I was the one that suggested we could work – that I could work by the hour –
>
> Question: Okay.
>
> Plaintiff: – after I was told I couldn't be foreman. And the reason I suggested it is because I thought maybe Charles had suggested it already, and Charles told me that Mike wasn't comfortable with it.
>
> Question: Okay.
>
> Plaintiff: Or he wasn't having anything to do with it, I think was Charles' words. Id. at 134.
>
> * * *
>
> Question: Let me just ask you what he said.
>
> Plaintiff: When I asked – when I was told that I could work through today or Friday, I asked what about working by the hour, and he said that was never an option. Id. at 193.

(Docket Entry No. 20 at 12-13). Plaintiff further asserts that Defendant's undue hardship argument fails because Defendant did not replace Plaintiff with another foreman and lacks any evidence of decreased profits or business. Id. at 20-22.

The Court concludes that material factual disputes preclude summary judgment in this action.

Plaintiff testified that he was uncomfortable with the hourly position, but offered to work in an hourly position and the Defendant's lack of Saturday work requiring three base crews after Plaintiff left the Defendant's employment raises disputed issues about its undue hardship defense. Thus, the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 18) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___ day of April, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court